UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RYAN COSGROVE, *individually and on behalf of all others similarly situated*,

                                        Plaintiff,

                    -v.-

OREGON CHAI, INC.,

                                        Defendant.

---

19 Civ. 10686 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

        In the past two years, counsel for Plaintiffs Ryan Cosgrove and Amanda Crout has filed numerous class action complaints across the country, including several in this District, challenging food manufacturers' use of the term "vanilla" in their descriptions or advertising.  *See, e.g., Twohig* v. *Shop-Rite Supermarkets*, — F. Supp. 3d —, No. 20 Civ. 763 (CS), 2021 WL 518021 (S.D.N.Y. Feb. 11, 2021); *Wynn* v. *Topco Assocs., LLC*, No. 19 Civ. 11104 (RA), 2021 WL 168541 (S.D.N.Y. Jan. 19, 2021); *Barreto* v. *Westbrae Nat., Inc.*, No. 19 Civ. 9677 (PKC), 2021 WL 76331 (S.D.N.Y. Jan. 7, 2021); *Cosgrove* v. *Blue Diamond Growers*, No. 19 Civ. 8993 (VM), 2020 WL 7211218 (S.D.N.Y. Dec. 7, 2020); *Pichardo* v. *Only What You Need, Inc.*, No. 20 Civ. 493 (VEC), 2020 WL 6323775 (S.D.N.Y. Oct. 27, 2020); *Steele* v. *Wegmans Food Mkts., Inc.*, 472 F. Supp. 3d 47 (S.D.N.Y. 2020); *see also Sharpe* v. *A&W Concentrate Co.*, — F. Supp. 3d —, No. 19 Civ. 768 (BMC), 2020 WL 4931045 (E.D.N.Y. Aug. 24, 2020).  In nearly all of these cases, the district court ultimately found that the plaintiffs had failed to state a viable claim for relief.  This time, Plaintiffs challenge Defendant Oregon Chai, Inc. ("Oregon Chai"), claiming that

Defendant's use of the term "vanilla" and other statements on the packaging of its chai tea latte powdered mix is misleading to consumers.  As set forth in the remainder of this Opinion, this Court agrees with the majority of district courts to have considered the matter, and dismisses the complaint for failure to state a claim.

**BACKGROUND**[1]

**A.     Factual Background**

According to the Second Amended Complaint (or "SAC"), Defendant Oregon Chai "manufactures, distributes, markets, labels[,] and sells powdered chai tea mix with a purported primary characterizing flavor of vanilla, under the Oregon Chai brand."  (SAC ¶ 1).  The packaging at issue is reproduced below:

---

[1]     The facts in this Opinion are drawn primarily from the well-pleaded allegations of Plaintiffs' Second Amended Complaint ("SAC" (Dkt. #25)), which is the operative pleading in this case.  For ease of reference, the Court refers to Defendant's Memorandum of Law in Support of Its Motion to Dismiss the Second Amended Complaint as "Def. Br." (Dkt. #32); Plaintiffs' Memorandum of Law in Opposition as "Pl. Opp." (Dkt. #29); and Defendant's Reply Memorandum of Law as "Def. Reply" (Dkt. #30).



(*Id.* at ¶ 4).

The packaging for the Oregon Chai products contains, among other items, references to: (i) "Vanilla," (ii) "Vanilla and honey combine with premium black tea and chai spices," and (iii) "Made with Natural Ingredients." (SAC ¶ 4). According to Plaintiffs, these references are misleading because

> [i] although labeled as "Vanilla," they have less (or no) real vanilla than the label represents, [ii] they are flavored with artificial vanillin, [iii] they contain more honey and cinnamon than vanilla and [iv] despite the representation they are "Made with Natural Ingredients" that gives reasonable consumers the impression that all of the ingredients … are natural, they contain synthetic ingredients and artificial flavors.

(*Id.* at ¶ 9).

As background to their claims, Plaintiffs include an extensive discussion of the flavor commonly known as vanilla, both as extracted from the vanilla bean and as replicated using other means. (SAC ¶¶ 10-19). Plaintiffs use the term "vanilla" to refer to the extract from the orchid *V. planifolia*, and "vanillin" to refer to the flavor compound. According to Plaintiffs, "only 1-2% of vanillin

in commercial use is vanillin obtained from the vanilla plant, which means that almost all vanillin has no connection to the vanilla bean." (*Id.* at ¶ 35). Indeed, Plaintiffs categorize various efforts to replicate the vanilla bean flavor as "food fraud" (*e.g.*, *id.* at ¶ 18), and argue more broadly that a global shortage of vanilla beans has prompted the flavor and food manufacturing industries — including Defendant's parent company, Kerry plc (the "Kerry Group") — to develop flavor alternatives that partially or completely replace the vanilla bean (*id.* at ¶¶ 21-35).

Plaintiffs allege that they and other consumers of the Oregon Chai products have been tricked into believing that the products have more vanilla than other flavors (such as cinnamon or honey), and that the vanilla flavor touted on the packaging comes from vanilla beans, as opposed to artificial vanillins. (SAC ¶¶ 57-78). In point of fact, according to a gas chromatography-mass spectrometry ("GC-MS") analysis summarized in the SAC, the Oregon Chai products contain "the abundance of cinnamon flavor yet a trace, if any, of real vanilla." (*Id.* at ¶ 56; *see also id.* at ¶ 67 (noting that "real vanilla … is likely present in a nominal amount far enough back in the supply chain so defendant can credibly and truthfully claim, 'Yes, the Products contain[] vanilla (extract.'")). Similarly, consumers are deceived by the Oregon Chai products' references in their packaging to "Made with Natural Ingredients," because (i) not all of the constituent ingredients are natural; (ii) apart from "dried honey," the ingredients list only contains a generic reference to "natural flavors" without further elaboration; and (iii) the reference suggests that the

4

vanilla flavor in the products is derived only from vanilla beans.  (*Id.* at ¶¶ 79-99).

Plaintiff Ryan Cosgrove lives in, and purchased Oregon Chai products in, the Bronx, New York.  (SAC ¶¶ 115, 119).  Plaintiff Amanda Crout lives in, and purchased Oregon Chai products in, Brooklyn, New York.  (*Id.* at ¶¶ 116, 121).  Each Plaintiff recites that she

> bought the Products because she liked chai, expected the vanilla flavor to only come from real vanilla beans because the front label lacked any reference to the Products being "flavored," thought that the Products would contain more vanilla than its other flavoring components, did not state it contained vanillin, an artificial flavor when used with vanilla and she believed it only contained natural ingredients.

(*Id.* at ¶¶ 120, 122).  Each Plaintiff also represents that she would buy the Oregon Chai products again "if [she] were assured the vanilla flavor in the Products was only from real vanilla and did not come from non-vanilla sources and was only made with natural ingredients."  (*Id.* at ¶ 123).

## B.    Procedural Background

Plaintiffs filed the original complaint in this action on November 18, 2019 (Dkt. #1), and an amended complaint on February 20, 2020 (Dkt. #19).  After a pre-motion conference that was held on March 19, 2020, in part to discuss Defendant's contemplated motion to dismiss, Plaintiffs filed a Second Amended Complaint on April 1, 2020.  (Dkt. #25).  The SAC alleges violations of New York's General Business Law ("GBL") Sections 349 and 350 and the federal Magnuson-Moss Warranty Act (the "MMWA"), Pub. L. 93-637, 88 Stat. 2183 (1975), *codified at* 15 U.S.C. Ch. 50; as well as common-law claims for

negligent misrepresentation, breach of warranty, fraud, and unjust enrichment. (*Id.* at ¶¶ 132-59).

Defendant filed its motion to dismiss and supporting brief on May 8, 2020 (Dkt. #28, 31-32); Plaintiffs filed their opposition brief on June 12, 2020 (Dkt. #29); and Defendant filed its reply brief on June 26, 2020 (Dkt. #30). After briefing had concluded, the parties filed several letters addressing decisions from other district courts resolving ostensibly similar cases. (Dkt. #33, 35-41).

## DISCUSSION

### A.   The Court Has Subject Matter Jurisdiction Under CAFA

#### 1.   Motions to Dismiss Under Fed. R. Civ. P. 12(b)(1)

Defendants begin by challenging the Court's jurisdiction to hear the matter in the first instance. (*See* Def. Br. 4-8). Federal Rule of Civil Procedure 12(b)(1) permits a party to move to dismiss a complaint for "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Lyons* v. *Litton Loan Servicing LP*, 158 F. Supp. 3d 211, 218 (S.D.N.Y. 2016) (quoting *Makarova* v. *United States,* 201 F.3d 110, 113 (2d Cir. 2000)); *see also Morrison* v. *Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008), *aff'd*, 561 U.S. 247 (2010).

The Second Circuit has identified two types of Rule 12(b)(1) motions: facial and fact-based. *See Carter* v. *HealthPort Techs., LLC*, 822 F.3d 47, 56-57 (2d Cir. 2016); *see also Katz* v. *Donna Karan Co., L.L.C.*, 872 F.3d 114, 119 (2d

Cir. 2017).  A facial Rule 12(b)(1) motion is one "based solely on the allegations of the complaint or the complaint and exhibits attached to it."  *Carter*, 822 F.3d at 56.  A plaintiff opposing such a motion bears "no evidentiary burden."  *Id.* Instead, to resolve a facial Rule 12(b)(1) motion, a district court must "determine whether [the complaint and its exhibits] allege[ ] facts that" establish subject matter jurisdiction.  *Id.* (quoting *Amidax Trading Grp.* v. *S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011) (per curiam)).  And to make that determination, a court must accept the complaint's allegations as true "and draw[ ] all reasonable inferences in favor of the plaintiff."  *Id.* at 57 (internal quotation marks and citation omitted).

"Alternatively, a defendant is permitted to make a fact-based Rule 12(b)(1) motion, proffering evidence beyond the complaint and its exhibits."  *Carter*, 822 F.3d at 57; *see also MMA Consultants 1, Inc.* v. *Rep. of Peru*, 719 F. App'x 47, 49 (2d Cir. 2017) (summary order) (defining fact-based Rule 12(b)(1) motion as one where "the defendant puts forward evidence to challenge the factual contentions underlying the plaintiff's assertion of subject-matter jurisdiction").  "In opposition to such a motion, [a plaintiff] must come forward with evidence of their own to controvert that presented by the defendant, or may instead rely on the allegations in the[ir p]leading if the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing."  *Katz*, 872 F.3d at 119 (internal citations and quotations omitted).  If a defendant supports a fact-based Rule 12(b)(1) motion with "material and

controverted" "extrinsic evidence," a "district court will need to make findings of fact in aid of its decision as to subject matter jurisdiction." *Carter*, 822 F.3d at 57.

### 2.      There Is a Reasonable Probability That Plaintiffs Meet the Jurisdictional Requirements of CAFA

Plaintiffs purport to represent a class of all New York purchasers of the Oregon Chai products during the applicable statutes of limitations.  (SAC ¶ 124).  They assert subject matter jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. 109-2, 119 Stat. 4-14 (2005), which requires that (i) at least one plaintiff and one defendant are citizens of different states; (ii) the putative class contains at least 100 members; and (iii) the amount in controversy exceeds $5 million in the aggregate, not including interest or costs.  28 U.S.C. § 1332(d); *see also Blockbuster, Inc.* v. *Galeno*, 472 F.3d 53, 56 (2d Cir. 2006).  Defendants focus their motion to dismiss on Plaintiffs' ability to satisfy CAFA's third prong.[2]

Unlike the original and first amended complaints, the SAC does not recite an amount in controversy.  (*Compare* Dkt. #1 at ¶ 43 *and* Dkt. #16 at ¶ 123, *with* Dkt. #25 at ¶¶ 107-14; *see also* Dkt. #28-2 (redline of first and second amended complaints)).  Presumably in response, Defendant included with its motion papers a declaration from Chris Rankin, Commercial Finance Manager with Oregon Chai's parent corporation, the Kerry Group, stating in

---

[2]      Plaintiffs allege that Defendant is an Oregon corporation with a principal place of business in Seattle, Washington.  (SAC ¶¶ 111, 117).  Defendant responds that its principal place of business is in fact in Beloit, Wisconsin.  (Def. Br. 2).  This correction does not affect the Court's jurisdictional analysis.

relevant part that during the applicable limitations period, Oregon Chai (i) sold 48,743 boxes and 8,992 tins of products in New York and (ii) realized $226,237 in total revenue from these sales.  (Dkt. #28-3 at ¶¶ 5-8).  Even assuming that each box was purchased by a separate putative class member and that each member would be entitled to $50 in statutory damages under GBL § 349(h), Defendants argue that the total damages could not exceed $2,886,750.  (Def. Br. 7-8).  In their opposition, however, Plaintiffs note that a larger statutory damages award of $500 is available under GBL § 350(e), which, using the one-package-to-one-class-member ratio offered by Defendants, would result in an award of $28,867,500 that would comfortably exceed CAFA's $5 million threshold.  (Pl. Opp. 2-3).

"Generally, the plaintiff, as the party asserting subject matter jurisdiction, has the burden of proving that it exists by a preponderance of the evidence." *Broidy Cap. Mgmt. LLC* v. *Benomar*, 944 F.3d 436, 443 (2d Cir. 2019), *cited in Henao* v. *Parts Auth., LLC*, No. 19 Civ. 10720 (LGS), 2020 WL 5751175, at *5 (S.D.N.Y. Sept. 25, 2020); *see also Cutrone* v. *Mortg. Elec. Registration Sys.*, 749 F.3d 137, 148 (2d Cir. 2014) (noting "reasonable probability" standard).  When "the defendant challenges the factual basis for the plaintiff's assertion of jurisdiction, '[j]urisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it.'" *Jordan* v. *Verizon Corp.*, 391 F. App'x 10, 12 (2d Cir. 2010) (summary order) (quoting *APWU* v. *Potter*, 343 F.3d 619, 623 (2d Cir. 2003)) (alteration in original).  "[T]he district court can refer to

evidence outside the pleadings when resolving a motion to dismiss under
Federal Rule of Civil Procedure 12(b)(1)." *Broidy*, 944 F.3d at 441 (internal
quotation marks and alterations omitted).

It is also generally the case that "[o]n a motion to dismiss challenging the
sufficiency of the amount in controversy, the sum claimed by the plaintiff
ordinarily controls, so long as it is claimed in good faith." *Stengel* v. *Black*,
No. 03 Civ. 0495 (GEL), 2004 WL 1933612, at *1 (S.D.N.Y. Aug. 30, 2004)
(citing *St. Paul Mercury Indem. Co.* v. *Red Cab Co.*, 303 U.S. 283, 289 (1938)).
Where, as here, the aggregate amount in controversy is not obvious from the
face of the complaint, the party invoking jurisdiction under CAFA must show is
that there is a "reasonable probability" that the amount in controversy meets
the threshold of $5 million. *Blockbuster*, 472 F.3d at 58. Here, too, "[w]here
the pleadings themselves are inconclusive as to the amount in controversy ...
federal courts may look outside those pleadings to other evidence in the
record." *United Food & Com. Workers Union* v. *CenterMark Props. Meriden
Square, Inc.*, 30 F.3d 298, 305 (2d Cir. 1994); *accord Smith* v. *Manhattan Club
Timeshare Ass'n, Inc.*, 944 F. Supp. 2d 244, 250 (S.D.N.Y. 2013).

Conversely, "the party opposing jurisdiction must show 'to a legal
certainty' that the amount recoverable does not meet the jurisdictional
threshold." *Shulman* v. *Chaitman LLP*, 392 F. Supp. 3d 340, 354 (S.D.N.Y.
2019). "[T]he legal impossibility of recovery must be so certain as virtually to
negate the plaintiff's good faith in asserting the claim. If the right of recovery is
uncertain, the doubt should be resolved in favor of the subjective good faith of

the plaintiff." *Chase Manhattan Bank, N.A.* v. *Am. Nat. Bank & Tr. Co. of Chicago*, 93 F.3d 1064, 1070 (2d Cir. 1996).

It is true that Plaintiffs' SAC omits an allegation regarding the amount in controversy. However, as demonstrated above, Plaintiffs are able to use the evidence Defendant submitted with its opening brief in order to establish a "reasonable probability" regarding the $5 million threshold. And while Defendant asks the Court to reject the GBL § 350(e) statutory penalties as "extraordinary" (Def. Reply 1 (citing *Belfiore* v. *Procter & Gamble Co.*, 311 F.R.D. 29 (E.D.N.Y. 2015))), the Court cannot conclude at this early stage of the litigation that Defendant has shown "to a legal certainty" that Plaintiffs have not met the amount in controversy threshold. Accordingly, the Court concludes that it has subject matter jurisdiction to hear this case.

## B.    The Court Dismisses Plaintiffs' Claims for Injunctive Relief

Defendant further argues that Plaintiffs lack standing under Article III to seek injunctive relief. (Def. Br. 22). Although standing challenges are sometimes brought under Rule 12(b)(6), "the proper procedural route is under Rule 12(b)(1)." *See All. for Env't Renewal, Inc.* v. *Pyramid Crossgates Co.*, 436 F.3d 82, 88 n.6 (2d Cir. 2006). Therefore, the Court will analyze Defendant's argument as if it were made in a motion pursuant to Rule 12(b)(1).

Defendant argues that Plaintiffs cannot satisfy the injury component of Article III because they have made clear that they will not purchase Oregon Chai products again absent assurances that "'the vanilla flavor in the Products was only from real vanilla and did not come from non-vanilla sources and was

11

only made with natural ingredients.'"  (Def. Br. 22 (quoting SAC ¶ 123)).

Plaintiffs respond that it is precisely their "inability to rely on the Products'

labels in the future, which causes them to avoid purchasing the Products even

though they would like to if they could trust the labels, [that] constitutes an

imminent threat of future harm sufficient to satisfy Article III's injury in fact

requirement."  (Pl. Opp. 23).  In an analogous factual context, this Court

analyzed Second Circuit caselaw on the issue, and concluded that a plaintiff's

failure to allege an actual intent to purchase the challenged product amounted

to a failure to "establish[] a likelihood of future injury sufficient to show

standing."  *Lugones* v. *Pete & Gerry's Organic, LLC*, 440 F. Supp. 3d 226, 239

(S.D.N.Y. 2020); *see also Axon* v. *Florida's Nat. Growers, Inc.*, 813 F. App'x 701,

703 n.1 (2d Cir. 2020) (summary order) ("Whether plaintiffs seeking injunctive

relief for consumer deception have standing where they allege that they would

buy the products in the future if not mislabeled is unsettled in this Circuit.").

The Court incorporates its prior analysis by reference, *see* 440 F. Supp. 3d at

238-38, and concludes similarly here that Plaintiffs lack standing to pursue

injunctive relief.

## C.    The Court Dismisses Plaintiffs' Other Claims for Failure to State a Claim

### 1.    Motions to Dismiss Under Fed. R. Civ. P. 12(b)(6)

The Court now turns to whether Plaintiffs have stated a claim upon

which relief can be granted.  When considering a motion to dismiss under

Federal Rule of Civil Procedure 12(b)(6), a court must "draw all reasonable

inferences in Plaintiff's favor, assume all well-pleaded factual allegations to be

true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted); *see also Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).  "In deciding a Rule 12(b)(6) motion, the court may consider only the facts alleged in the pleadings, documents attached ... or incorporated by reference in the pleadings, and matters of which judicial notice may be taken."  *Hu* v. *City of N.Y.*, 927 F.3d 81, 88 (2d Cir. 2019).

A plaintiff is entitled to relief if she alleges "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge plaintiff's claims across the line from conceivable to plausible." (internal quotation marks omitted) (citing *Twombly*, 550 U.S. at 570)).

"Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).  Moreover, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*

**2. Plaintiffs Have Failed to State a Claim Under GBL §§ 349 and 350**

    **a. Overview of Plaintiffs' Claims**

The SAC focuses on the Oregon Chai products' packaging, and in particular the representations "Oregon Chai," "Vanilla," Vanilla and honey combine with premium black tea and chai spices," and "Made with Natural Ingredients." (SAC ¶ 4). According to Plaintiffs, the last three of these representations, individually and in tandem, mislead consumers concerning the amount, the percentage, and the types of ingredients in the Oregon Chai products. (*Id.* at ¶¶ 38-99). Plaintiffs argue that Defendant's prominent use of the term "Vanilla," along with the identifying description of "Vanilla and honey combine with premium black tea and chai spices," foster the misimpression that the vanilla flavor is present in an amount greater than the honey and the chai spices, when in fact there is more honey and cinnamon in the products. (*Id.* at ¶¶ 40-45, 57-61). Plaintiffs reason that the prominent use of the term "Vanilla" also fosters the misimpression that the vanilla flavor is derived from vanilla beans, rather than artificial vanillin. (*Id.* at ¶¶ 62-78). Finally, Plaintiffs argue that the products' reference to "Made with Natural Ingredients" is misleading on several levels: it reinforces the impression that the vanilla flavor is derived from vanilla beans and not artificial vanillin, and it suggests (falsely, according to Plaintiffs) that the products do not contain any synthetic or artificial ingredients. (*Id.* at ¶¶ 79-99).

### b.    GBL §§ 349 and 350 Generally

"The standard for recovery under General Business Law § 350, while specific to false advertising, is otherwise identical to section 349," *Goshen* v. *Mut. Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 324 n.1 (2002), and therefore the Court will merge its analysis of the two claims.  In order to plead a sufficient claim under either § 349 or § 350, "a plaintiff must allege [i] that the defendant … engaged in consumer-oriented conduct; [ii] that the conduct was materially misleading; and [iii] that the plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Weisblum* v. *Prophase Labs. Inc.*, 88 F. Supp. 3d 283, 292 (S.D.N.Y. 2015).  Plaintiffs are not required to meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) for their claims.  *See Daniel* v. *Mondelez Int'l, Inc.*, 287 F. Supp. 3d 177, 186 (E.D.N.Y. 2018).

The Second Circuit has clarified that:

> The primary evidence in a consumer-fraud case arising out of allegedly false advertising is, of course, the advertising itself. And in determining whether a reasonable consumer would have been misled by a particular advertisement, context is crucial. For example, under certain circumstances, the presence of a disclaimer or similar clarifying language may defeat a claim of deception.

*Fink* v. *Time Warner Cable*, 714 F.3d 739, 742 (2d Cir. 2013) (internal citations omitted).  And while such claims may be fact-intensive, a court retains the discretion in appropriate circumstances to conclude as a matter of law that an allegedly deceptive advertisement would not have misled a reasonable

consumer.  *See id.* at 741 (citing, *inter alia*, *Oswego Laborers' Local 214 Pension Fund* v. *Marine Midland Bank*, 85 N.Y.2d 20 (1995)).

The SAC contains references to the Pure Food and Drugs Act of 1906, Pub. L. 59-384, 34 Stat. 768 (1907), as well as regulations and letters issued by the Food and Drug Administration (the "FDA").  (*See, e.g.*, SAC ¶¶ 12, 38-46, 62-63, 74-77, 83-89, 99).  Purported violations of these FDA pronouncements form the basis for the bulk of Plaintiffs' claims here.  When reminded by Defendant that there is no private right of action to enforce FDA regulations (*see* Def. Br. 8-11), Plaintiffs responded that (i) they use federal regulations as a touchstone for deceptive behavior and (ii) their claims cannot be preempted because New York State has adopted the federal labeling laws (Pl. Opp. 3-8).  This Court agrees with Defendant that Plaintiffs' second argument appears nowhere in the SAC and cannot be raised for the first time in opposition to a motion to dismiss.  (Def. Reply 3).  *See Cal Distrib., Inc.* v. *Cadbury Schweppes Ams. Beverages. Inc.*, No. 06 Civ. 496 (RMB), 2007 WL 54534, at *6 (S.D.N.Y. Jan. 5, 2007) ("[I]t is axiomatic that [a][c]omplaint cannot be amended by the briefs in opposition to a motion to dismiss[.]" (internal citation omitted)).  Moreover, not every violation of a federal regulation can support a GBL claim:

> [A] GBL claim is viable where the plaintiff "make[s] a free-standing claim of deceptiveness under GBL § 349 that happens to overlap with a possible claim" under another statute that is not independently actionable, but fails where the violation of the other statute by conduct that is not inherently deceptive is claimed to constitute a deceptive practice that serves as the basis for the GBL § 349 claim.

*Nick's Garage, Inc.* v. *Progressive Cas. Ins. Co.*, 875 F.3d 107, 127 (2d Cir. 2017) (quoting *Broder* v. *Cablevision Sys. Corp.*, 418 F.3d 187, 200 (2d Cir. 2005)).  Accordingly, to the extent that the conduct ascribed to Defendant is inherently deceptive, it supports a claim under the GBL, irrespective of whether it also may constitute a violation of one or more FDA regulations.  *See generally N. Am. Olive Oil Ass'n* v. *Kangadis Food Inc.*, 962 F. Supp. 2d 514, 519 (S.D.N.Y. 2013) (distinguishing violations of FDA and New York state labeling standards from actionable claims under GBL §§ 349 and 350).

### c.   False Advertising Decisions Since *Mantikas*

In the area of false advertising claims, this Court does not write on a blank slate, but rather benefits from extensive analyses recently undertaken in the Second Circuit and its constituent district courts.  It begins with the Second Circuit's seminal 2018 decision in *Mantikas* v. *Kellogg Co.*, 910 F.3d 633 (2d Cir. 2018), a case that concerned claims on packaging that crackers were "whole grain" or "made with whole grain," when in fact the grain content was principally enriched white flour.  In reversing the district court's dismissal of the case, the Court found that:

> Plaintiffs' core allegation is that the statements "WHOLE GRAIN" and "MADE WITH WHOLE GRAIN" are misleading because they communicate to the reasonable consumer that the grain in the product is predominantly, if not entirely, whole grain.  Contrary to the reasonable expectations communicated by the large, bold-faced claims of "WHOLE GRAIN," however, the grain in the product is predominantly enriched white flour.  While the disclosures on the front of the box relied on by the district court ("MADE WITH 5G [OR 8G] OF WHOLE GRAIN PER SERVING") do set forth

17

> accurately the amount of whole grain in the crackers
> per serving, they are nonetheless misleading because
> they falsely imply that the grain content is entirely or at
> least predominantly whole grain, whereas in fact, the
> grain component consisting of enriched white flour
> substantially exceeds the whole grain portion.

*Id.* at 637.

Further, the Second Circuit rejected arguments that information on the reverse side of the packaging, in the listing of ingredients, could clarify any potential misimpressions and thereby negate a claim of false advertising.  While it was true that the ingredients list recited a 29-gram serving size, it did not identify what portion of the serving size was grain, and by extension did not explain the ratio of whole grain to white flour.  More fundamentally, the Court rejected arguments that a reasonable consumer should be required to consult the ingredients list for information that contradicts, rather than confirms, information in larger type on the front of the package.  *Mantikas*, 910 F.3d at 637.  Finally, the Court rejected defense efforts to analogize the case to other decisions in which courts had rejected claims that plaintiffs were misled "about the quantity of an ingredient that obviously was not the products' primary ingredient," *id.* at 638, such as the percentage of vegetables in a cracker or fruit in a cookie.

Since *Mantikas*, a number of district courts in this Circuit have considered claims regarding references to "vanilla" in the packaging of various food products.  Earlier cases in this category focused on whether inclusion of the term "vanilla" presupposed that the source of the flavor was the vanilla bean.  In *Steele* v. *Wegmans Food Markets, Inc.*, 472 F. Supp. 3d at 47, the

court considered ice cream packaging that prominently displayed the word

"Vanilla," and recited that it was "Made with Milk, Cream and Natural Vanilla

Flavor."  In dismissing the plaintiffs' complaint, the court explained the thought

process of the reasonable buyer:

> Although they are processed almost simultaneously by the buyer, to analyze the total effect of the messages on the container it is useful to consider them in sequence. The buyer's first desire is for ice cream, and when he is in the frozen food area he must select, from many choices (chocolate, lemon, mint, lime, etc.) the one he wants.  Thus the large-type "Vanilla" is of immediate use.  Of course he is not looking for a bowl of vanilla, and the next largest words confirm that the container holds ice cream.  Those who prefer natural ingredients will note that it has natural vanilla flavor, and no artificial flavors.  Evidently there are various natural substances which have a vanilla flavor.  Those interested in the actual ingredients can read the list, which mentions neither vanilla beans nor extracts, but they will not learn the components, amounts or proportions of the Natural Flavor.

*Id.* at 50.  The court further distinguished the case from *Mantikas* by noting

that the packaging

> does not mention vanilla beans, or bean extract, and even if vanilla or bean extract is not the predominant factor, if the sources of the flavor are natural, not artificial, it is hard to see where there is deception.  What is misrepresented?  The ice cream is vanilla flavored.  The sources of the flavor are natural, not artificial.

*Id.*  Addressing arguments similar to those raised in *Steele*, the district court in

*Cosgrove* v. *Blue Diamond Growers*, 2020 WL 7211218, at *3, came to a nearly

identical conclusion:

> The Court finds the Product is not misleading because a reasonable consumer would associate the

> representation of 'Vanilla' — with no additional
> language modifiers — to refer to a flavor and not to
> vanilla beans or vanilla extract as an ingredient. … The
> large font 'Vanilla' on the front of the Product allows the
> consumer to quickly understand the flavor of the
> almond milk and differentiate between products.  The
> Product makes no additional representations about
> how that flavor is achieved.

*Id.* (internal citations omitted)).

The court in *Pichardo* v. *Only What You Need, Inc.*, 2020 WL 6323775, addressed a vanilla flower vignette and the words "Smooth Vanilla" on the packaging of a non-dairy, vanilla-flavored protein beverage.  *Id.* at *1. The plaintiffs to that suit included in their pleadings (i) a GC-MS analysis that made clear that the vanilla taste did not derive exclusively from the vanilla plant, and (ii) a consumer survey that purported to demonstrate that more than 70% of respondents believed the flavor to come "only from vanilla beans," and that almost 50% of respondents would be less likely to purchase the product if they knew the flavor did not come solely from the vanilla plant.  *Id.* Even with this additional information, the district court dismissed the complaint with prejudice, finding that a reasonable consumer would not be misled by the defendant's label.  In so concluding, the district court analogized the case to *Steele*, finding no references to the product being "made with vanilla extract" or even "vanilla extract."  *Id.* at *3.[3]  The court also amplified the *Steele* court's distinction of *Mantikas*:

---

[3]     The *Pichardo* also court emphasized the plaintiffs' allegation, contained here in the SAC, that the vast majority of vanillin used commercially does not derive from vanilla extract. *See Pichardo* v. *Only What You Need, Inc.*, No. 20 Civ. 493 (VEC), 2020 WL 6323775, at *5 (S.D.N.Y. Oct. 27, 2020) ("[G]iven Plaintiffs' acknowledgement that the vast majority

In *Mantikas* v. *Kellogg Co.*, the Second Circuit reversed a grant of a motion to dismiss. 910 F.3d 633 (2d Cir. 2018). The Second Circuit found that labeling Cheez-Its crackers as "whole grain" could be misleading because it falsely implies that the predominant ingredient is whole grain flour, not white flour. *Id.* at 637. *But those facts are not analogous largely because vanilla describes both a taste and an ingredient.* There is a clear difference between whole grain flour and white flour — whole grain flour has more fiber and more nutrients than white flour. In fact, capitalizing on that difference, Kellogg created a separate Cheez-Its product made with whole grain as a healthier alternative to Cheez-Its Original, which are made with white flour. Other food products also clearly designate whether they are made with whole grain flour, specifically because the presence of whole grain flour (as opposed to white flour) is significant from a health perspective. But vanilla products are not similar. *A vanilla product that exclusively uses vanilla extract for vanilla flavor is not healthier — or materially different in any other way — than a vanilla product that uses vanillin from some other natural source.* Unlike whole grain and white flour products, vanilla products are not even divided into those that are flavored exclusively with vanilla extract and those that are not. Implying that whole grain flour is the dominant ingredient when, in fact, the dominant ingredient is white flour can be misleading because, given the labeling, reasonable consumers would expect a different, healthier product. In contrast, stating that a protein drink is vanilla flavored when it is, even without clarifying the source of the vanilla, does not mislead because reasonable consumers would expect a vanilla taste, and that is exactly what they get.

*Id.* at *4 (emphases added). Separately, the court found that the mere use of

the term "vanilla" did not imply that there were no other flavoring ingredients.

---

of vanilla flavored commercial products do not derive their flavor entirely from vanilla extract, it is not plausible to allege that a reasonable consumer would understand that the vanilla flavoring in a beverage is derived entirely from vanilla extract.").

Alternatively, the *Pichardo* court found that even if the "vanilla" reference were misleading, the amount of vanilla extract in the product would not have been material to the reasonable consumer:

> Plaintiffs supplement their conclusory allegation with their survey results that "show that almost 50% of the consumer survey respondents would be less likely to purchase the product if the vanilla flavor did not come [exclusively] from a vanilla plant." The problem with that argument is that it runs headlong into Plaintiffs' acknowledgement in the original complaint that approximately 98% of commercial vanillin does not come from vanilla extract. Because the Court can take judicial notice that the grocery store shelves are stocked with many vanilla-flavored beverages that sell just fine, the Court cannot accept the conclusory allegation contained in the FAC as a well-pled allegation that consumers view the percentage of vanilla taste that derives from vanilla extract to be a material fact that influences consumers' buying habits.

2020 WL 6323775, at *6 (record citations omitted). The failure to allege materiality presented a second, independent basis for dismissal.

In other class actions involving references to "vanilla," the plaintiffs have separately claimed deception because the packaging has failed to disclose the presence of artificial ingredients. Sister courts in this District have generally rejected such arguments. In *Barreto* v. *Westbrae Natural, Inc.*, 2020 WL 76331, the packaging on the challenged soy milk included the references "Vanilla" and "Natural Vanilla Flavor with Other Natural Flavors"; a GC-MS analysis, however, found only a "*de minimis*" amount of vanilla, as well as maltol, which the plaintiff alleged to be a "synthetic flavoring substance" under certain FDA regulations. *Id.* at *1. For reasons similar to those discussed *supra* in this section, the district court rejected the argument that inclusion of the descriptor

22

"Vanilla" was itself deceptive.  Of note, however, the court also rejected the plaintiff's challenge to the "natural" flavor references, finding: (i) both vanillin and maltol can be derived from natural and artificial sources; (ii) the results of the GC-MS analysis "d[id] not purport to identify the source of the vanillin as natural or artificial"; (iii) "[a]lthough the GS-MS analysis detected maltol, it contain[ed] no finding whether the maltol was derived artificially or naturally."

*Id.* at *3-4.  The *Barreto* court concluded:

> Here, neither the front label of Westbrae's Vanilla Soymilk nor the ingredient panel claim to identify the predominate source of its vanilla flavor other than that it is "Natural Vanilla Flavor With Other Natural Flavors."  The Complaint and testing results on which it relies do not claim that there is no natural vanilla in the product but only that it is a *de minimis* amount.  The Complaint further urges that the label and ingredient panel are materially misleading because natural vanilla is not the predominate source of the vanilla flavor.  But the Complaint concedes that "only 1-2% of vanillin in commercial use is vanillin obtained from the vanilla plant[.]" (Compl. ¶ 26).  A reasonable consumer would not draw a conclusion as to the quantity or predominance of the natural vanilla flavor so long as some of the vanilla flavor was derived from natural vanilla and the balance from other natural flavors.  Like the product's labeling in *Steele*, *Pichardo*[,] and *Cosgrove*, Westbrae's product makes a representation regarding its flavor and does not imply or represent the source of that flavor comes exclusively or predominantly from natural vanilla.

*Id.* at *4; *accord Wynn*, 2021 WL 168541 at *5-6 (dismissing complaint in case involving vanilla almond milk, finding insufficient allegations that purportedly artificial flavors vanillin, maltol, and piperonal were in fact artificially, as opposed to naturally, derived); *see also Twohig*, 2021 WL 518021, at *3-7 (same, citing, *inter alia*, *Barreto* and *Wynn*).

The Court's research has disclosed one instance in this Circuit in which a vanilla false advertising case was permitted to proceed.  The court in *Sharpe* v. *A&W Concentrate Co.*, No. 19 Civ. 768 (BMC), 2020 WL 4931045 (E.D.N.Y. Aug. 24, 2020), considered packaging for root beer and cream soda that included the phrase "MADE WITH AGED VANILLA," when in fact the vanilla flavor was derived predominately from ethyl vanillin, an artificial, synthetic ingredient.  To bolster their deception arguments, the plaintiffs had included a survey of 411 consumers that was conducted in March 2020, in which "68% of surveyed consumers believed that the statement meant that the vanilla flavor 'comes from a vanilla plant, such as a vanilla extract, which is made from vanilla beans from the vanilla plant.'"  *Id.* at *2.  Relying on *Mantikas*, its own review of the packaging, and the plaintiffs' survey results, the district court denied the defendant's motion to dismiss:

> Foremost, the use of the word "aged" suggests to consumers that the vanilla content is naturally derived and has acquired a desirable quality upon the passage of time.  By holding out their products as containing "aged vanilla," defendants' representation is the equivalent to stating the beverages are "Made With Natural Vanilla."

> Indeed, in some respects, this case presents a stronger case of misrepresentation than in *Mantikas*.  There, the disputed ingredient, whole grain, was at least present in a discernable quantity (5 to 8 grams out of a serving size of 29 grams).  In contrast, plaintiffs here allege that the desired or preferred ingredient is entirely absent or, alternatively, *de minimis* in quantity when compared to the artificial and synthetic substitute for vanilla.

*Id.* at *5; *see also id.* ("After viewing the label of the products in context and accepting plaintiffs' allegations as true, I hold that plaintiffs have plausibly

alleged that the 'MADE WITH AGED VANILLA' representation — prominently displayed underneath the A&W logo and on front of the bottle or box, bolded and in all capital letters — falsely implies that any vanilla content derives predominantly from the vanilla plant, instead of its artificial and synthetic counterpart.  This determination is further bolstered by the persuasive extrinsic evidence that the overwhelming percentage of consumers share this misconception.").[4]

---

[4]    Another recent decision similarly focused on the difference between flavors and ingredients in denying a motion to dismiss.  The plaintiff in *Campbell* v. *Whole Foods Market Group, Inc.*, No. 20 Civ. 1291 (GHW), 2021 WL 355405 (S.D.N.Y. Feb. 2, 2021), complained about the packaging for Whole Foods' organic honey graham crackers, which packaging depicted the words "honey" and "graham" in much larger typeface than "crackers" and contained a depiction of several crackers next to a bowl of honey. According to the complaint, the crackers (i) were sweetened primarily with sugar and contained only miniscule amounts of honey, and (ii) contained more refined flour than whole wheat flour.  *Id.* at *2.  In concluding that the plaintiff had stated viable claims under GBL §§ 349 and 350, the district court focused on the facts that: (i) consumers increasingly sought out products made with whole wheat flour rather than refined flour because of nutritional benefits, including comparatively more fiber; (ii) the "graham" in graham cracker referred to whole wheat flour and was an ingredient rather than a flavor; (iii) a reasonable consumer could interpret the "graham" reference on the packaging to conclude that the grain in the product was predominantly, if not exclusively, whole grain; (iv) consumers consider honey to be preferable to sugar as a sweetening agent; (v) the design and placement of the term "honey" in the packaging, as well as the depiction of a bowl of honey with the crackers, could lead a reasonable consumer to interpret the term "honey" as an ingredient rather than a flavor; and (vi) this same design and placement could lead a reasonable consumer to conclude that honey was the predominant sweetener of the product.  *Id.* at *5-8.  In so doing, the *Campbell* court specifically distinguished "the manifold cases evaluating descriptions of 'vanilla' products," on the grounds that "there is no basis in the complaint for the Court to conclude that the flavor of honey can come from a product other than honey."  *Id.* at *8; *but cf. Kennedy* v. *Mondelez Glob. LLC*, No. 19 Civ. 302 (ENV) (SJB), 2020 WL 4006197 (E.D.N.Y. July 10, 2020) (report and recommendation recommending dismissal of analogous claim, reasoning that labeling products "grahams" or "graham crackers" did not misleadingly imply that the products contained more graham or whole wheat flour than white flour).

### d.   Plaintiffs Have Failed to Allege an Actionable Misrepresentation

While the instant case is not identical to any of those just discussed, the logic of those cases leads this Court to conclude that Plaintiffs' allegations concerning the Oregon Chai products' packaging do not suffice to state an actionable claim under GBL §§ 349 or 350.  On the front of the packaging, the word "Vanilla" appears just below the words "Chai Tea Latte" in a slightly larger font.  (SAC ¶ 4).  However, as in *Steele*, *Pichardo*, and *Cosgrove*, the term appears to describe a flavor more than an ingredient — more particularly, to distinguish the vanilla flavor from Defendant's other chai tea latte flavors, including "The Original," "Salted Caramel," and "Spiced."  *See* https://oregonchai.com/our-products/ (accessed February 21, 2021).[5]

Plaintiffs have perhaps a better argument with respect to the statement, "Vanilla and honey combine with premium black tea and chai spices," insofar

---

[5]   "[A] court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and it is capable of accurate and ready determination."  *Wells Fargo Bank* v. *Wrights Mill Holdings*, 127 F. Supp. 3d 156, 167 (S.D.N.Y. 2015) (internal quotation omitted).  On the theory that the provision of different flavors of chai tea latte products may have been of recent vintage, the Court also examined archival copies of Defendant's website using the Internet Archive Wayback Machine (https://archive.org/web/), where it observed similar flavor offerings.  *See Distributorsoutlet.com, LLC* v. *Glasstree, Inc.*, No. 11 Civ. 6079 (PKC) (SLT), 2016 WL 3248310, at *2 (E.D.N.Y. June 10, 2016) (collecting cases where "courts have taken judicial notice of the contents of web pages available through the Wayback Machine as facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned under Federal Rule of Evidence 201").  Under Federal Rule of Evidence 201(e), the parties are entitled to be heard on the propriety of taking judicial notice of the Wayback Machine.  *See* Fed. R. Evid. 201(e) ("On timely request, a party is entitled to be heard on the propriety of taking judicial notice and the nature of the fact to be noticed.  If the court takes judicial notice before notifying a party, the party, on request, is still entitled to be heard.").  The parties may submit a letter limited to this issue within 14 days of the date of this Opinion, though the Court observes that it would have reached the same conclusion regarding Plaintiff's GBL §§ 349 and 350 claims even without reference to Defendant's website.

as, in context, "vanilla" and "honey" appear to be ingredients (as distinguished from flavors) alongside the tea and chai spices.  (SAC ¶ 4).  Even then, there is nothing to suggest the exclusive, or even predominant, use of vanilla beans as opposed to other sources.  There is no reference to "vanilla bean" or "vanilla extract" anywhere on the packaging; nor is there any reference to the product being "made with" or "made from" any part of the vanilla plant (the reference instead being "Made with Natural Ingredients");[6] nor is there anything comparable to the "aged vanilla" claim made in *Sharpe.*  Indeed, there is nothing in the remainder of the Oregon Chai products' packaging that suggests the exclusive or predominant use of vanilla beans:  The depiction of the product is surrounded by cinnamon sticks, cloves, and fresh and dried tea leaves, with neither vanilla beans nor honey present.  And the ingredient list on the back of the products confirms, and does not contradict, the statements on the front; it lists as ingredients, in descending order of predominance, sugar, dried whole milk, dried nonfat milk, dried honey, tapioca maltodextrin, instant black tea, maltodextrin, salt, and natural flavors.  (*Id.* at ¶ 5).  *Accord Barreto*, 2021 WL 76331, at *3-4.

---

[6]     *Cf. Campbell*, 2021 WL 355405, at *6 n.5:

> The absence or presence of the words "made with" can make a substantial difference where the relevant term is both an ingredient and a flavor. "Made with" designates a product as an ingredient. But, in the case of a base ingredient, such as flour, which is not alleged to have a distinctive flavor that can be created by something other than the ingredient itself, the phrase "made with" can be redundant.

Plaintiffs counter that the references to "natural ingredients" and "natural flavors" are themselves deceptive because (i) they allow Defendant to hide the fact that there is more cinnamon than vanilla in the products (SAC ¶ 61); (ii) they give the impression that the vanilla flavor in the Products is only from natural vanilla beans and not artificial vanillin (*id.* at ¶ 80); and (iii) the products also contain synthetic ingredients including maltol, limonene, and linalool (*id.* at ¶ 85).[7]  Taking the claims in order, the Court rejects as a matter of law Plaintiffs' broader argument that consumers were or could be deceived for GBL purposes about the relevant quantities of vanilla, honey, and cinnamon in the Oregon Chai products.  On this point, it bears noting that consumers were selecting among chai tea lattes.  Plaintiffs themselves adopt a definition of chai that includes tea and unspecified spices in no particular proportions.  (*See* SAC ¶ 7 and n.1).  There is nothing in the SAC to suggest that, so long as the products contained vanilla, honey, and chai spices (which can include cinnamon), any consumer would be deceived by the packaging in this case.  Plaintiffs do not allege, nor is the Court aware, of a common understanding of the ingredients in chai, as there is for graham crackers, nor is there any nutritional basis for a consumer to prefer one proportion of these flavor ingredients to another.[8]

---

[7]     For the reasons outlined *supra* at 15-16, the Court rejects Plaintiffs' argument that the term "Made with Natural Ingredients" is misleading because the reasonable consumer's understanding of the term "comports with that of federal regulators and common meaning."  (SAC ¶ 91).

[8]     Unlike in other of the vanilla false advertising cases, Plaintiffs have offered no consumer surveys suggesting confusion by or deception of the chai tea latte-consuming public.  (*See* SAC ¶ 90 (discussing, in conclusory terms, contemplated surveys and other market

For similar reasons, the Court rejects Plaintiffs' argument that references to "natural ingredients" or "natural flavors" lead inexorably to the conclusion that the vanilla flavor in the Oregon Chai products is derived from vanilla beans and not artificial vanillin.  For starters, Plaintiffs' use of the term "artificial vanillin" proves too much, as Plaintiffs concede that the flavor derived from the vanilla bean can be replicated by both natural and artificial means. (*See* SAC ¶ 18).  And while Plaintiffs' GC-MS analysis was inconclusive, they posit that "[t]he high level of vanillin detected, without the other marker compounds is consistent with industry practice where vanillin is added to a drop of real vanilla to 'fortify' or 'spike' a vanilla taste." (*Id.* at ¶ 72).  Such speculation straddles the *Iqbal/Twombly* plausibility line, but even were the Court to accept it, it could not accept Plaintiffs' corollary argument that the inclusion of vanillin derived from "a natural source and made through a natural process" with vanilla extract would nonetheless be deceptive under the GBL because it may run afoul of FDA regulations.  (*Id.* at ¶ 73).  As previously noted, the statements in the Oregon Chai products' packaging, in context, cannot fairly be read to claim that the vanilla flavor derives exclusively, or even predominantly, from vanilla beans or vanilla extract.  Defendant's use of the terms "natural ingredients" and "natural flavors" only confirms that analysis.

---

research)).  As the Second Circuit has observed, in order to state a claim, "plaintiffs must do more than plausibly allege that a 'label might conceivably be misunderstood by some few consumers.'" *Jessani* v. *Monini N. Am., Inc.*, 744 F. App'x 18, 19 (2d Cir. 2018) (summary order) (quoting *Ebner* v. *Fresh Inc.*, 838 F.3d 958, 965 (9th Cir. 2016)).  Instead, they must "plausibly allege 'that a significant portion of the general consuming public or of targeted customers, acting reasonably in the circumstances, could be misled.'"  *Id.* (quoting *Ebner*, 838 F.3d at 965).

There remains Plaintiffs' allegation that the terms "natural ingredients" and "natural flavors" are false because the Oregon Chai products include maltol, limonene, and linalool.  On this point, Defendant argues principally that the "use of the word 'natural' alone does not convey that a product is composed exclusively of natural ingredients."  (Def. Br. 15).  But while persuasive at first blush, the force of the argument is undercut by the Second Circuit's analysis in *Mantikas*:

> [T]he rule that Defendant contends emerges from these district court decisions — that, as a matter of law, it is not misleading to state that a product is made with a specified ingredient if that ingredient is in fact present — would validate highly deceptive advertising and labeling.  Such a rule would permit Defendant to lead consumers to believe its Cheez-Its were made of whole grain so long as the crackers contained an iota of whole grain, along with 99.999% white flour. Such a rule would validate highly deceptive marketing.

*Mantikas*, 910 F.3d at 638.

This Court instead resolves the issue using the analysis adopted by the *Barreto*, *Wynn*, and *Twohig* courts, which examined the pleadings to see whether there were any non-conclusory allegations that the flavoring substance in question was derived from artificial sources.  *See Barreto*, 2021 WL 76331, at *4; *Wynn*, 2021 WL 168541, at *5-6; *Twohig*, 2021 WL 518021, at *6-7 & n.6).  As Plaintiffs note, maltol, limonene, and linalool are listed by the FDA among "synthetic flavoring substances and adjuvants."  (SAC ¶¶ 86, 88 (citing 21 C.F.R. §§ 172.515(b), 182.60)).  However, the FDA classifies each as an "artificial flavor or artificial flavoring ... *except* where these are derived from natural sources."  21 C.F.R. § 101.22(a)(1) (emphasis added).  The three district

court decisions cited in this paragraph addressed maltol, and concluded that the respective pleadings did not plausibly allege that the maltol was derived from artificial rather than natural sources.  This Court reaches the same conclusion upon examination of the SAC.  Further, the Court observes that both limonene and linalool can be derived from natural sources, and concludes that Plaintiffs have similarly failed to plausibly allege that either or both of these flavoring substances was derived from an artificial source.  *See* Limonene, Merriam-Webster, https://www.merriamwebster.com/dictionary/limonene ("a widely distributed terpene hydrocarbon $C_{10}H_{16}$ that occurs in essential oils (as of oranges or lemons) and has a lemon odor") (last visited February 21, 2021); Linalool, Merriam-Webster, https://www.merriamwebster.com/dictionary/linalool ("a fragrant liquid alcohol $C_{10}H_{18}O$ that occurs both free and in the form of esters in many essential oils and is used in perfumes, soaps, and flavoring materials") (last visited February 21, 2021).[9]

---

[9]    As noted, the *Mantikas* Court distinguished a series of cases in which the alleged misrepresentations concerned "the quantity of an ingredient that obviously was not the products' primary ingredient," such as the vegetable content in a cracker:

> In our case of Cheez-Its crackers, in contrast, reasonable consumers are likely to understand that crackers are typically made predominantly of grain.  They look to the bold assertions on the packaging to discern what type of grain.  The representation that a cracker is "made with whole grain" would thus plausibly lead a reasonable consumer to conclude that the grain ingredient was entirely, or at least predominately, whole grain.  That same consumer, confronted with the claim that a cracker is "made with real vegetables," likely would not likely conclude that the cracker was made predominantly of vegetables.

910 F.3d at 639.  The *Sharpe* court "conclude[d] that the principle resulting from *Mantikas* may also apply in circumstances in which the alleged misrepresentation pertains to a preferred, non-primary ingredient," in that case, the vanilla flavoring in

In sum, viewing each of the challenged statements in context, the Court concludes as a matter of law that Plaintiffs have failed to plausibly allege a violation of GBL §§ 349 and 350.  To the extent the reasonable consumer would view the "vanilla" reference as an ingredient rather than a flavor of chai tea latte, there is nothing in the packaging to suggest that the vanilla is sourced exclusively or predominantly to vanilla beans or vanilla extract.  Nor would the reasonable consumer be misled by the packaging's references to natural ingredients or natural flavors, as Plaintiffs have failed plausibly to allege that the challenged flavoring substances were artificially derived.

### 3. Plaintiffs Have Failed to State a Claim for Negligent Misrepresentation

Plaintiffs alternatively assert claims for negligent misrepresentation, breach of warranty, fraud, and unjust enrichment.  As other courts resolving similar claims have observed, the failure of Plaintiffs' overarching theory of misleading business practices dooms these claims as well.  *See, e.g.*, *Barreto*, 2021 WL 76331, at *6 (dismissing claims for negligent misrepresentation, fraud, breach of warranty, and unjust enrichment on the basis that the court had "already determined that [plaintiff] has failed to allege that the product's

---

root beer and cream soda.  *See* 2020 WL 4931045, at *6 (collecting cases).  This Court does not resolve in this Opinion whether a trace amount of an artificial ingredient would constitute a violation of GBL §§ 349 or 350.

labeling would be likely to deceive or mislead a reasonable consumer"); *Wynn*,
2021 WL 168541, at *6-7.[10]

To state a claim for negligent misrepresentation under New York law, a
plaintiff must plead "[i] the existence of a special or privity-like relationship
imposing a duty on the defendant to impart correct information to the plaintiff;
[ii] that the information was incorrect; and [iii] reasonable reliance on the
information." *Mandarin Trading Ltd.* v. *Wildenstein*, 16 N.Y.3d 173, 180 (2011);
*see also Anschutz Corp.* v. *Merrill Lynch & Co.*, 690 F.3d 98, 114 (2d Cir. 2012)
(explaining that New York law strictly limits negligent misrepresentation claims
to "situations involving actual privity of contract between the parties or a
relationship so close as to approach that of privity" (internal quotation marks
omitted)).  In addition to the pleading deficiencies outlined in the preceding
section, the negligent misrepresentation claim also fails because Plaintiffs have
not plausibly alleged the existence of a special relationship or a privity-like
relationship with Defendant.  *See generally Campbell*, 2021 WL 355405, at *11
& n.10 (collecting cases for proposition that engaging in a "basic commercial
transaction … does not give rise to the kind of special relationship necessary to
maintain a claim for negligent misrepresentation" and rejecting argument
nearly identical to that made by Plaintiffs here that the requisite relationship is
adequately alleged by claim that defendant had "unique or special expertise").

---

[10]     With respect to these remaining claims, the Court acknowledges its debt to Judge
Castel for his analysis in *Barreto* and to Judge Abrams for her analysis in *Wynn*.

33

### 4.     Plaintiffs Have Failed to State a Claim for Breach of Warranty

### a.     There Is No Viable Claim for Breach of an Express Warranty

Plaintiffs' several warranty claims fare no better.  "New York breach of express warranty claims require [i] a *material statement* amounting to a warranty; (ii) the buyer's *reliance* on this warranty as a basis for the contract with his immediate seller; (iii) the *breach* of this warranty; and (iv) injury to the buyer *caused* by the breach." *Brady* v. *Basic Rsch., L.L.C.*, 101 F. Supp. 3d 217, 235 (E.D.N.Y. 2015) (quoting *Avola* v. *La.-Pac. Corp.*, 991 F. Supp. 2d 381, 391 (E.D.N.Y. 2013)).  Furthermore, such a claim requires that "a buyer ... provide the seller with timely notice of the alleged breach of warranty." *Quinn* v. *Walgreen Co.*, 958 F. Supp. 2d 533, 544 (S.D.N.Y. 2013) (citing N.Y. U.C.C. § 2-607(3)(a)).  Here, Plaintiffs have failed to allege that the Oregon Chai products do not comport with the statements on their packaging, and thus have failed to allege a breach of any warranty.  Moreover, Plaintiffs neglected to give any notice, much less timely notice,[11] and their arguments for an exception to this rule (*see* Pl. Opp. 18), have been rejected by this Court in an analogous case, the analysis of which is incorporated herein by reference.  *See Lugones*, 440 F. Supp. 3d at 244-45.

---

[11]     The SAC recites that "Plaintiffs provided or will provide notice to defendant, its agents, representatives, retailers and their employees" (SAC ¶ 152), but there is no indication in the pleadings or the briefing that Plaintiffs provided timely notice of the breach to Defendant.  To the contrary, as discussed in the text, Plaintiffs argue for an exception to the notice requirement in their opposition brief.

### b.   There Is No Viable Claim for Breach of an Implied Warranty of Merchantability

Plaintiffs also claim a breach of the implied warrant of merchantability. Under the New York Uniform Commercial Code, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." N.Y. U.C.C. § 2-314(1); *see generally Brodie* v. *Green Spot Foods, LLC*, — F. Supp. 3d —, No. 20 Civ. 1178 (ER), 2020 WL 7027594, at *4 (S.D.N.Y. Nov. 30, 2020) (citing *Mongiello's Italian Cheese Specialties, Inc.* v. *Euro Foods Inc.*, No. 14 Civ. 2902 (DF), 2018 WL 4278284, at *37 (S.D.N.Y. Mar. 30, 2018) (recognizing an implied warranty of merchantability in contract for sale of deli meats)). To be merchantable, goods "must be … fit for the ordinary purposes for which such goods are used; and … conform to the promises or affirmations of fact made on the container or label if any." N.Y. U.C.C. § 2-314(2).

Significantly, however, "[a] warranty of merchantability … does not mean that the product will fulfill a buyer's every expectation but rather simply provides for a minimum level of quality." *Ackerman* v. *Coca-Cola Co.*, No. 09 Civ. 395 (JG), 2010 WL 2925955, at *25 (E.D.N.Y. July 21, 2010) (quoting *Viscusi* v. *Proctor & Gamble*, No. 05 Civ. 1528 (DLI) (LB), 2007 WL 2071546, at *13 (E.D.N.Y. July 16, 2007)) (internal quotation marks removed). "Where the sale of a food or beverage is concerned, courts have ruled that the product need only be fit for human consumption to be of merchantable quality." *Silva* v. *Smucker Nat. Foods, Inc.*, No. 14 Civ. 6154 (JG) (RML), 2015 WL 5360022, at *11 (E.D.N.Y. Sept. 14, 2015). The SAC asserts that: "The Products did not

conform to their affirmations of fact and promises due to defendant's actions and were not merchantable." (SAC ¶ 154). However, because Plaintiffs do not suggest that the Oregon Chai products are not fit for human consumption, they fail to state a claim for breach of the implied warranty of merchantability under New York law. Additionally, New York law "requires a showing of privity between the manufacturer and the plaintiff." *Ebin* v. *Kangadis Food Inc.*, No. 13 Civ. 2311 (JSR), 2013 WL 6504547, at *6 (S.D.N.Y. Dec. 11, 2013); *accord Hesse* v. *Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 470 (S.D.N.Y. 2020). Plaintiffs acknowledge that they did not obtain the Oregon Chai products directly from Defendant (SAC ¶¶ 119, 121), and thus do not adequately allege privity.

### c.   There Is No Viable Claim Under the Magnuson-Moss Warranty Act

Finally, Plaintiffs allege a claim under the MMWA, which "grants relief to [ ] consumer[s] 'who [are] damaged by the failure of a ... warrantor ... to comply with any obligation ... under a written warranty.'" *Bowling* v. *Johnson & Johnson*, 65 F. Supp. 3d 371, 375 (S.D.N.Y. 2014) (quoting *Wilbur* v. *Toyota Motor Sales, U.S.A., Inc.*, 86 F.3d 23, 26 (2d Cir. 1996)) (alterations in original). Under the statute, a "written warranty" is defined as "any written affirmation of fact or written promise ... which ... affirms or promises that such material ... will meet a specified level of performance over a specified period of time." 15 U.S.C. § 22301(6)(A). At its core, however, the MMWA "merely incorporates and federalizes state-law breach of warranty claims, including state-law

standards for liability and damages." *Ebin*, 2013 WL 3936193, at *3 (citing *Diaz* v. *Paragon Motors of Woodside, Inc.*, 424 F. Supp. 2d 519, 540 (E.D.N.Y. 2006) ("The MMWA ... creates no additional bases for liability, but allows a consumer to recover damages under existing state law[.]")).

Defendant argues principally that Plaintiffs have failed to identify a qualifying written warranty under the MMWA, and that the statement "Made with Natural Ingredients" is insufficient as a matter of law.  (Def. Br. 18-19).  In their opposition brief, Plaintiffs responded to other of Defendant's challenges to their warranty claims (*see* Pl. Opp. 18-20), but offered no response to the MMWA arguments.  Accordingly, the Court find the claim to be abandoned. *See Campbell*, 2021 WL 355405, at *14 ("Plaintiff has abandoned this claim by failing to brief the issue in response to Defendant's motion to dismiss." (collecting cases)).  In any event, the Court finds that the absence of a qualifying warranty necessitates dismissal of the MMWA claim.  *See Garcia* v. *Chrysler Gr. LLC*, 127 F. Supp. 3d 212, 232 (S.D.N.Y. 2015) ("To state a claim under the MMWA, plaintiffs must adequately plead a cause of action for breach of written or implied warranty under state law.").

### 3.  Plaintiffs Have Failed to State a Claim for Fraud

To state a claim for fraud under New York law, a plaintiff must allege that (i) the defendant made a misrepresentation or material omission of fact, (ii) that was false and known to be false by the defendant, (iii) made for the purpose of inducing the plaintiff to rely upon it, (iv) the plaintiff's justifiable reliance on the misrepresentation or material omission, and (v) injury.

*Pasternack* v. *Lab'y Corp. of Am. Holdings*, 27 N.Y.3d 817, 827 (2016); *see In re Fyre Festival Litig.*, 399 F. Supp. 3d 203, 212-13 (S.D.N.Y. 2019).  Claims for fraud, even under state law, must also satisfy the heightened pleading requirements of Rule 9(b).  *See Premium Mortg. Corp.* v. *Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009); *see generally Malvar Egerique* v. *Chowaiki*, No. 19 Civ. 3110 (KPF), 2020 WL 1974228, at *23 (S.D.N.Y. Apr. 24, 2020).[12]  Here, Plaintiffs fall at the first hurdle:  For all of the reasons outlined above, Plaintiffs have not alleged an actionable misrepresentation or omission.  Accordingly, the fraud claim will be dismissed.

### 4.    Plaintiffs Have Failed to State a Claim for Unjust Enrichment

Finally, Plaintiffs allege a claim for unjust enrichment.  A claim for unjust enrichment under New York law requires a plaintiff to allege that "[i] defendant was enriched; [ii] at plaintiff's expense; and [iii] equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover."  *Diesel Props S.r.l.* v. *Greystone Bus. Credit II LLC*, 631 F.3d 42, 55 (2d Cir. 2011) (internal quotation marks omitted).  Plaintiffs' unjust enrichment claim is premised on the same theory of misrepresentation this Court has rejected, and is pleaded in a single sentence:  "Defendant obtained benefits and monies because the Products were not as represented and expected, to the detriment and impoverishment of plaintiffs and class

---

[12]    Specifically, Rule 9(b) requires a plaintiff to specify the fraudulent statements, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent.  *See Eternity Glob. Master Fund Ltd.* v. *Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 186-87 (2d Cir. 2004).

members, who seek restitution and disgorgement of inequitably obtained profits." (SAC ¶ 161). "Where a deceptive trade practices claim fails for failure to allege deception, an unjust enrichment claim fails, too." *Kennedy* v. *Mondelez Glob. LLC*, No. 19 Civ. 302 (ENV) (SJB), 2020 WL 4006197, at *15 (E.D.N.Y. July 10, 2020) (citing *Axon*, 813 F. App'x at 706); *accord Harris* v. *Mondelez Glob. LLC*, No. 19 Civ. 2249 (ERK) (RER), 2020 WL 4336390, at *3 (E.D.N.Y. July 28, 2020).

## CONCLUSION

For all of the foregoing reasons, the Court grants Defendant's motion to dismiss the SAC pursuant to Rules 12(b)(1) and 12(b)(6). Because Plaintiffs have twice amended their complaint after receiving pre-motion letters from Defendant, and because Plaintiffs' one-clause request for leave to amend in their opposition (*see* Pl. Opp. 25) does not explain how they can cure the deficiencies identified in this Opinion, this Court dismisses the SAC with prejudice. *Cf. Nat'l Credit Union Admin. Bd.* v. *U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257-58 (2d Cir. 2018) ("When a plaintiff was aware of the deficiencies in his complaint when he first amended, he clearly has no right to a second amendment even if the proposed second amended complaint in fact cures the defects of the first. Simply put, a busy district court need not allow itself to be imposed upon by the presentation of theories seriatim." (alteration, footnote, and internal quotation marks omitted)).

The Clerk of Court is directed to terminate all pending motions, adjourn all pending dates, and close this case.

SO ORDERED.

Dated:      February 22, 2021
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge